489 P.2d 615

**UTAH RESOURCES INTERNATIONAL, INC., a Utah corporation, et al., Plaintiffs and Respondents.**

v.

**UTAH BOARD OF STATE LANDS et al., Defendants and Appellants.**

No. 12131.

Supreme Court of Utah.

Sept. 30, 1971.

Vernon B. Romney, Atty. Gen., Sheridan L. McGarry and Joseph P. McCarthy,

Asst. Attys. Gen., Salt Lake City, for defendants and appellants.

Adam M. Duncan, Salt Lake City, for plaintiffs and respondents.

James R. Brown, and Robert G. Pruitt, Jr., of Neslen & Mock, Salt Lake City, for Gas Producing Enterprises, Inc., amicus curiae.

On Rehearing

HENRIOD, Justice:

Appeal from an injunction preventing the Board from granting an "oil shale" lease on land on which plaintiffs had an "oil, gas and hydrocarbon" lease. We said the injunction was proper in this case, reported in 25 Utah 2d 344, 481 P.2d 677, (which we shall call the second Morgan case) by a split decision, in which one justice concurred in the main opinion, one concurred in the result (the author here) and two dissented. On petition for rehearing a majority of the court saw fit to grant it and to re-examine the case,—which now we do,—reversing that decision, with no costs awarded.

The present case is a sequel to Morgan v. Utah Board of State Lands, 21 Utah 2d 364, 445 P.2d 776 (1968), which we will call the first Morgan case, and which plaintiffs say is dispositive here. In our decision from whence this rehearing springs, and with come confusion, we technically agreed with plaintiffs, but now, on rehearing and upon further examination, we recant,—and doing so do not equivocate,—since the first Morgan case factually was somewhat different, and whose reasons for its result equally were somewhat debatable.

There are two reasons why we must conclude other than we did previously in this case:

I. The plaintiffs, in equity and at law, are impaled upon the horns of a dilemma which we did not discern: That they are seeking equity to relieve themselves of a conscious, intelligent, knowledgeable and experience-inspired promise to accept and subscribe to a lease specifically *excluding* "oil shale,"—which they now negate. That subscription should have ended this case on a simple motion to dismiss, because it is most obvious that if these experienced people deliberately agreed for the exclusion of oil shale they cannot under the simplest principles of contract say they didn't mean what they said and signed—and it would make no difference whether oil shale had hidden in it kerogen, cabbages, coal oil or kings,—and with our present decision we spare them the invalidation of their lease on any grounds anent lack of manifestation of mutual assent, mutuality of intention, or meeting of the minds, whichever phrase one wishes to use. Deciding as we do, the plaintiffs have lost nothing which they spe-

cifically and apodictically agreed to get, and the State has lost nothing that it equally and as apodictically agreed to give. It is almost unthinkable that the parties here, under the plain, unambiguous terms of the lease, either individually or collectively could have intended the phrase "excluding coal and oil shale" to mean "including coal and oil shale,"—upon which matter hereinafter we will elaborate. This, although this phase of the case was not made a numbered point by respondent on appeal, it being however in the argument because of the very nature of this litigation and arguments pertinent thereto.

II. The instant case which was argued and almost entirely bottomed by plaintiffs on our decision in Morgan v. Utah Board of State Lands, 21 Utah 2d 364, 445 P.2d 776 (1968), wherein the controversy was between the same parties as those in the instant case, is clearly distinguishable. That suit was to enjoin the Board from issuing an "oil and gas" lease to a third party while there was a subsisting "bituminous sand" lease in favor of the plaintiffs there. The issue in that case was restrictive and was said by Mr. Justice Tuckett to be as follows:

"We are here concerned chiefly with the issue as to whether or not the oil recoverable *under the bituminous sand* lease is the same mineral as that recoverable *under an oil and gas lease*," and we unanimously concluded that it was, and we were justified, so doing, because the record reflected that it was.[1]

Nothing was said in that case about oil shale, which is not a liquid in its natural state, and is not porous in the sense that bituminous sand is. It produces "shale oil," which respected authority says is a different natural material than, and contains a different substance produced from the pool of liquid oil or that found in the porous bituminous sands. The record reflects that unlike the material found in the last two formations, the material in oil shale is "shale oil" and not "oil" or "petroleum" in the accepted sense, and respected authority also classifies the two types differently as to chemical composition, chemical reaction, insolubility, and synthesis characteristics.[2]

---

1. Like water in a ditch is the same as the water squeezed out of a sponge dipped in the ditch.

2. Jaffee, Mineral Industries Bulletin (1962), Vol. 5, No. 2, Colorado School of Mines, which has this say:
   "Paradoxically, oil shale is not necessarily a shale, nor does it contain oil. It can be broadly defined as a fine-grained, compact sedimentary rock, which is gener-

ally laminated, and containing an organic high-molecular weight mineraloid of indefinite composition, which is derived chiefly from aquatic organisms, probably of algae origin, or from waxy spores and pollen grain. This organic matter is called kerogen, from the two Greek words meaning producer of wax. Thus, the name of kerogen shale has also been suggested as being more appropriate than oil shale. One property which is essen-

It would appear that plaintiffs must have agreed with the facts and conclusions above, since one of the plaintiffs, Mr. Morgan, Jr., testified that "We were helpful and instrumental in getting Senate Bill 77 passed in the year 1967 and the reason was because we knew that because of the enactment of this bill, we would eliminate conflict." Two years later he signed a lease that specifically excluded coal and oil shale. Consistency and logic certainly call for the conclusion that under such circumstances to "eliminate conflict" and at the same time to subscribe to an exclusion of "coal and oil shale" two years later resolved any doubts as to elimination of conflict in favor of the inescapable conclusion that oil shale clearly was intended *by him and the Land Board* not to have been included in a conventional "oil and gas" or its twin "bituminous sands" lease (First Morgan case). Carrying the logic a wee bit further, inescapably would mean that Mr. Morgan, signer of the lease, recognized that the 1967 legislature in Title 65–1–18, as amended (Chap. 183, Sec. 2, Laws of Utah 1967), *also* intended that oil shale was not included in a conventional "oil and gas" or its twin "bituminous sands" lease (First Morgan case).

Some other significant circumstances point to a recognition that oil shale is something different from, and the subject of different regulatory and taxing authority of governmental units.[3]

Although the distinction is significant, it would seem to be irrelevant under the clear terms of the lease. If the Land Board, under the 1967 legislation, was of the frame of mind to lease state land to someone for the purpose of prospecting for and developing petroleum in a natural liquid state, but insisted on excluding oil to be extracted from bituminous sands, as is the case here with respect to "oil shale," it would be an over-the-counter, take-it-or-leave-it deal, and if a lessee acceded to such terms, but later said, as is argued here, that the

tial to all types of true oil shales is that their organic constituent is only slightly soluble, if at all, when extracted with ordinary solvents for petroleum at room temperature. Also, kerogen yields petroleum hydrocarbons only upon destructive distillation by heat (pyrolysis) and subsequent refining (Bradley, 1931; Gavin, 1924; Levorsen, 1958). It is important to note that retorting of *oil shale yields shale oil, which is not petroleum*, but rather a black waxy oil, which freezes at room temperature, and contains not only carbon and hydrogen, but also oxygen, nitrogen and sulphur. Special refining methods are required to convert shale oil into marketable products (Ertl.1955).

\* \* \* \* \*

'*Oil shales should not be confused with rocks which are actually impregnated with oil*, for example, the Athbaska sandstone (tar sand) of Alberta, Canada \* \* \* and finally, organic mineral substances.' "

3. Mineral Leasing Act, 30 U.S.C. 181 et seq.; 1969 Tax Reform Act, Secs. 501 and 502. See also Rev. Ruling 57–529, 1957, I.R.Bull. 45, 17; Land Board Rules, 10 and 11.

bituminous sand or oil and gas exclusion was void since it already was included in the oil-in-liquid state category, his lease would be worthless as lacking a manifestation of mutual assent, and a representation of unconscionability hardly in consonance with the length of the Chancellor's foot.

We point out these differences, not in extenso, but simply to illustrate that the first Morgan case of 1968, had to do only with the issue of whether "oil and gas" leases covered the same mineral as "bituminous sands" leases,—not whether either or both covered "oil shale" leases, which were not before the court. The records reflect, in our opinion, that it is evident that oil and gas, and bituminous sands leases have to do with a mineral in place containing an identical substance, while an oil shale lease does not cover that same substance, and that two separate minerals are involved. Gas and oil leases historically have been considered mineral, as have oil shale leases, and we are inclined to the opinion and we conclude that each is a "license to hunt" for the minerals in their natural state and not a fishing license for an end product that might be oil, coal oil, synthetic fuel or lubricants, diamonds, nylons, cosmetics or other items of a purely synthetic nature.

It would seem that plaintiffs here who were the plaintiffs in the first Morgan case of 1968, hardly can quarrel with such a conclusion when they said:

"The propriety of the Land Board's distinguishing between oil and coal or gilsonite *or kerogen* (the organic component of oil shale) was never an issue in the lawsuit" and that *"Morgan is aware of no reason why these various substances should not be classified as different minerals;* each one has a different molecular structure from each of the others; no one of them occurs in close physical or chemical association with any of the others, and there is no evidence that the recovery of any one of these substances would necessarily entail recovery or destruction of the others."

We believe and hold that the quoted statement made in plaintiffs' brief in the first Morgan case, though not necessarily binding on them in the second case, nonetheless is correct, and that consequently the first Morgan case, having to do with an identical mineral found in two restricted in-place formations, i. e., petroleum pools or bituminous sands, does not govern oil shale, the subject of the second Morgan case,—and the subject of rehearing here. In that respect, any language or dictum as to any organic or chemical material not synonymous with oil and gas and bituminous sands, is not to be construed as requiring inclusion of such material within the four corners of Title 65–1–18, Utah Code Annotated, as amended (Chap. 183, Sec. 2, L.Utah 1967), which is the basis for the present litigation, as it was in the

first Morgan case, and whose pertinent part reads as follows:

"The state land board may issue mineral leases including without limitation oil, gas and hydrocarbon leases for prospecting, exploring, developing, and producing minerals covering any portions of the state lands or the reserved mineral interests in state lands. *In furtherance of the principle of multiple use* of state lands, the land board may grant a lease for the prospecting, exploration, development and production of any mineral notwithstanding the issuance of other lease or leases on the same land for other minerals, *and shall include in such lease suitable stipulations for simultaneous operation.* The board shall not issue more than one outstanding lease *for the same purpose* on the same land. * * *"

In this connection the majority of the court recognizes that our learned colleague, Justice Tuckett, who authored both of the Morgan cases prior to this petition for rehearing is of a different opinion, and it is only fair to say that he can point to an unanimous court in the first Morgan case to support his thesis, and here to one concurrence and one in the result by the third, the author here, with dissents from two others. Such a state of the record, however, reflects that two justices did not concur with the conclusion in the second Morgan case to the effect that oil shale was either a subject discussed or intended for adjudication in the first Morgan case that dealt strictly and only with 1) oil and gas and/or 2) bituminous sands, nor did they concede that oil shale was identical to liquid petroleum in place in a pool or in porous or partially saturated bituminous sand formation. The author of this opinion had reservations about this aspect of the case, and concurred in the result, which seemed at the time to be somewhat meritorious but based on questionable and debatable reasons. I am now of the studied opinion that any doubts must be resolved in favor of the "multiple use" concept which, it must be noted, specifically is referred to in the statute itself, reflecting a legislative intent to promote diversified development of different minerals found in state lands by the issuance of more than one lease,—and we determine that the considerable preponderance of evidence favors a conclusion that a) "oil shale" is a mineral physically and chemically different than mobile petroleum in pools and bituminous sands such as to justify our further conclusion that b) the legislature under 65–1–18 intended it to be subject to lease separately and distinctly from the only two materials treated in the first Morgan case, i. e., oil pools and bituminous sands. This conclusion resolves any argument that the part of the statute saying that the board could not issue more than one lease for the same "purpose" on the same land was intended to mean some chemically processed article,

perhaps of a strictly synthetic nature rather than to search for mineral in its natural state.

Besides the concession made by plaintiffs in the first Morgan case and quoted above anent classification of oil, coal, kerogen, etc. as different minerals, we think the evidence clearly preponderates to show that the two identical minerals involved in the first Morgan case are so different in many ways from oil shale as to justify our decision that the legislature intended that oil shale should be the subject of a lease as being "any mineral notwithstanding the issuance of other lease or leases on the same land for other minerals."

This conclusion is borne out by many authorities and circumstances that pattern and reflect it in the record.

Although plaintiffs strongly object to defendants' mentioning it in their briefs and quoting from a speech given to the senate by the director of the Utah State Land Board, on the grounds it was only the opinion of an employee, not subject to cross-examination and not the subject of judicial notice, such speech was noted and referred to in the Senate Journal for 1967 at p. 599, as having been given,—which is a subject for judicial notice. The speech was recorded electronically. There is no denial that it was given. Although it was not offered in evidence, but only in the briefs, and the question of the electronic recording being a novel one with respect to judicial notice, a matter we are not called upon to decide, we repeat a portion of it here anyway, as an aid in interpreting legislative intent, as we would look to reputable treatises or documents authored by eminent authorities on a particular subject. The Director said this:

"The purposes of drafting the bill are very simple: First of all there would be extensive revision of the Land Board general leasing policies. It would permit the Board to adopt a form of lease, *the so-called single form of hydrocarbon lease which would grant to the lessee the right to produce all hydrocarbons except oil shale and coal. Oil shale and coal would be excepted.* The Land Board in the past year and a half has conducted many and extensive public hearings on this subject and is convinced that it would be in the best interest of the state to issue this so-called single form of hydrocarbon lease."

It seems significant that following that speech and within a month thereafter, the statute in question was passed (March 6, 1967), approved March 21, 1967, effective May 9, 1967, as Chap. 183, Sec. 2, L.Utah 1967. It is also highly significant that about two years later, *after the first Morgan case had been decided* by this court on October 10, 1968, the legislature *on March 13, 1969,* passed H.B. 211, being Chap. 220,

L.Utah *1969*, entitled "An Act * * * Providing for the Authorization of the Board's Participation in the Development of Oil Shale Technology * * * [etc.]" The act was exclusively devoted to development and rentals of *one* mineral, *and one mineral only*, oil shale,—and failed entirely to include oil, gas or other hydrocarbons or bituminous sands. It would seem almost inescapable to conclude other than that the legislature, by this act, considered oil shale, for the purpose of leasing, as a mineral other than oil in pools or in porous bituminous sands, hence leaseable as a different mineral under the 1967 act. It seems very much more significant that almost before the printer's ink had dried, and but eight days after the passage of that act, these plaintiffs, who assert a wide and long knowledgeability and experience in the development of oil, which we do not dispute, deliberately became signatories to a lease that granted rights to plaintiffs to explore for and discover oil and other hydrocarbons and a number of other minerals but "EXCLUDING COAL AND OIL SHALE", —which quoted language they now presume to ignore, and presume to ask this court to agree to, which would seem to prick the conscience of equity were we to canvass it. (Emphasis ours.)

CALLISTER, C. J., and ELLETT and CROCKETT, JJ., concur.

TUCKETT, Justice (dissenting).

I dissent. In the case of Morgan v. Utah Board of State Lands referred to in the majority opinion as the first Morgan case, we were concerned with certain language used in Section 65–1–18. In 1967, the legislature amended the above section. The section, as amended, contained the following sentence:

The board shall not issue more than one outstandiig lease for the same purpose on the same land.

We construed the language to mean that the legislature intended to adopt a policy of allowing but one lease for the extraction of oil from any particular tract of state land.

Since that decision was handed down in 1968, two general sessions of the legislature have taken place and that body has not seen fit to make any changes in the statute, even though the matter was called to the attention of the lawmakers.